UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA PARKER PENNINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TETRA TECH EC, INC., et al.,<br><br>Defendants. | Case No. 18-cv-05330-JD<br><br>**ORDER RE FINAL APPROVAL OF CLASS SETTLEMENT WITH LENNAR DEFENDANTS; GOOD FAITH SETTLEMENT DETERMINATION; AND ATTORNEY'S FEES AND COSTS**<br><br>Re: Dkt. Nos. 175, 200, 201 |

Plaintiffs in this consolidated action are current and former homeowners who purchased a home in Parcel A of the former Hunters Point Naval Shipyard (HPNS). Plaintiffs say their home values were diminished because of the "continuing toxic nature of the Superfund and former nuclear testing site upon and near plaintiffs' homes." Dkt. No. 157 (TAC) ¶ 2. Plaintiffs have named two groups of defendants in their complaint: (1) the Tetra Tech defendants (Tetra Tech, Inc.; Tetra Tech EC, Inc.; William Dougherty; and Andrew Bolt), and (2) the Lennar defendants (Lennar Corporation; HPS1 Block 50 LLC; HPS1 Block 51 LLC; HPS1 Block 52 LLC; HPS1 Block 53 LLC; HPS1 Block 54 LLC; HPS1 Block 56/57 LLC; Five Point Holdings, Inc.; HPS Development Co., L.P.; and Emile Haddad). *Id.* ¶¶ 120-28.

Plaintiffs allege that the Tetra Tech defendants "failed to remediate the nuclear and toxic materials at HPNS as contracted, [and] falsified soil sample testing results to show the toxic and nuclear materials at HPNS were at acceptable levels." *Id.* ¶ 235. The Lennar defendants are alleged to have had "actual and/or constructive notice that defendant Tetra Tech was not performing cleanup, remediation, and/or testing responsibilities properly," and failing to "pursue its own investigation or alert government regulators, the public or potential homeowners of the

risk of the property being contaminated." *Id*. ¶ 236. Plaintiffs state seven claims against each defendant: (1) permanent public nuisance; (2) permanent private nuisance; (3) unfair and unlawful competition; (4) fraud and false advertising; (5) negligence; (6) negligent misrepresentation; and (7) intentional misrepresentation. *Id*. ¶¶ 228-342. Among other relief, plaintiffs seek compensation for the "damages to their properties, including but not limited to the purchase price and/or the decrease in value of the properties." *Id*. at 87 (Prayer for Relief) ¶ 6.

Plaintiffs have entered into a class settlement with the Lennar defendants only, which the Court has preliminarily approved. Dkt. No. 154. The Lennar defendants now request a good faith settlement determination, Dkt. No. 201, and plaintiffs ask for final approval of the class settlement and for attorney's fees and costs, Dkt. Nos. 200 & 175. The motions are granted.

## DISCUSSION

### I. GOOD FAITH SETTLEMENT DETERMINATION

The determination of a good faith settlement is governed by California Code of Civil Procedure (CCP) Sections 877 and 877.6. Under CCP Section 877, "[w]here a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, . . . : (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater; [and] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties." Section 877.6 further provides that "(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obliger from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault; [and] (d) The party asserting the lack of good faith shall have the burden of proof on that issue."

In *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, 38 Cal. 3d 488 (1985), the California Supreme Court concluded that the dual goals under the statutes are the "equitable sharing of costs

1  among the parties at fault" and the "encouragement of settlements." 38 Cal. 3d at 494 (quotations
2  and citation omitted).  To determine whether a settlement was made "in good faith" in light of
3  those goals, the Court is to consider factors "including a rough approximation of plaintiffs' total
4  recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of
5  settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement
6  than he would if he were found liable after a trial." *Id*. at 499.  Other pertinent factors are the
7  financial circumstances and insurance policy coverage of settling defendants, as well as the
8  "existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling
9  defendants." *Id*.  "The party asserting the lack of good faith, . . . , should be permitted to
10 demonstrate, if he can, that the settlement is so far 'out of the ballpark' in relation to these factors
11 as to be inconsistent with the equitable objectives of the statute." *Id*. at 499-500.  Even so, the
12 pretrial settlement approval process is decidedly not a "full-scale minitrial." *Id*. at 499.

13         The Tetra Tech defendants focus their good faith challenge entirely on the first two factors,
14 and say that the Lennar defendants are paying too little in the proposed settlement with plaintiffs
15 in relation to their proportionate liability as between the two groups of defendants.  Dkt. No. 204.
16 The Lennar defendants have agreed to make a total cash payment of $6.3 million to the settlement
17 class, Dkt. No. 201 at 1, and the parties agreed for purposes of the good faith settlement
18 determination that plaintiffs' maximum theoretical recovery is about $48 million.  *See* Dkt. No.
19 204 at 12 n.4; Dkt. No. 123-4 ¶ 27.  The maximum recovery figure was adjusted to $51.5 million
20 for purposes of final approval, Dkt. No. 200-4 ¶ 27, but that relatively modest upwards adjustment
21 does not make a material difference for the good faith determination and the Tetra Tech
22 defendants do not argue otherwise.  *See* Dkt. No. 216 at 16:4-17:2.

23         The Tetra Tech defendants' objection is not well taken.  They say that the Lennar
24 defendants did not make timely disclosures to plaintiffs despite "kn[owing] in 2014 about
25 allegations of [Tetra Tech's] data falsification." Dkt. No. 204 at 1.  They rely heavily on Tetra
26 Tech EC, Inc.'s 2014 Investigation Report.  *See*, *e.g.*, *id*. at 2-3, 8-9; Dkt. No. 216 at 9:1-21.  But
27 the report is by no means the conclusive evidence of the Lennar defendants' knowledge that Tetra
28 Tech presents it to be.  On its face, the Executive Summary for the 2014 Investigation Report

3

1    described "corrective actions" that had been taken by Tetra Tech and stated that "[c]ompletion of
2    these corrective actions has resulted in consistent, high-quality Final Status Survey results.  These
3    corrective actions ensured that additional samples have been collected and handled in full
4    compliance with the Sampling and Analysis Plan.  TtEC has not had a recurrence of the type of
5    soil sample results that led to this investigation, indicating that the corrective actions have
6    addressed the problem."  Dkt. No. 204-4 at ECF p. 6.  This document is consequently poor support
7    for Tetra Tech's assertion that the Lennar defendants are obviously the primarily culpable
8    defendants here, because they failed to disclose the contents of the 2014 Investigation Report to
9    potential homebuyers.  The Tetra Tech defendants' position is all the more doubtful because, as
10   they acknowledge, in October 2014, "NBC Bay Area published a news story titled 'Contractor
11   Submitted False Radiation Data at Hunters Point,' which contained a link to the entire 2014
12   Investigation Report."  Dkt. No. 204 at 3.

13          Tetra Tech also misses the mark in suggesting that the Lennar defendants "should bear all
14   of the liability based on their failures to disclose" because plaintiffs have "fail[ed] to identify the
15   Tetra Tech parties' legal duty to them as purchasers of properties at The SF Shipyard from the
16   Developers."  *Id*. at 13.  Plaintiffs' complaint plainly alleges that "Tetra Tech's work was initiated
17   by the United States and was intended to, and did, affect the plaintiffs," and that "[t]he Tetra Tech
18   defendants were aware that their work was intended to prepare the Shipyard for redevelopment
19   into residential and commercial space."  TAC ¶ 296.  On that basis, plaintiffs alleged that "Tetra
20   Tech owed a duty to plaintiffs to exercise reasonable and ordinary care in investigating and
21   remediating the SF Shipyard and to avoid causing economic and other injury to the plaintiffs."  *Id*.
22   ¶ 297.  This was the main claim on which plaintiffs sued both groups of defendants.  Plainly put,
23   plaintiffs alleged that the Tetra Tech defendants did not remediate the soil at HPNS and falsified
24   soil sample test results to cover up that default, *id*. ¶ 235, and that the Lennar defendants failed to
25   investigate these issues and inform plaintiffs about them.  *Id*. ¶ 236.

26          To be sure, the Court is not at this time making findings of fact or determinations of law
27   about any defendant's liability to plaintiffs.  *See Tech-Bilt*, 38 Cal. 3d at 499 (the good faith
28   settlement determination is not to be turned into a "full-scale minitrial").  All that is required here

4

is a decision on the arguments and evidence offered by Tetra Tech pursuant to CCP Sections 877 and 877.6. In light of the record before the Court, the Tetra Tech defendants have not demonstrated that the "settlement is so far 'out of the ballpark'" that it cannot be approved as a good faith settlement. *Tech-Bilt*, 38 Cal. 3d at 499-500.

      The first two *Tech-Bilt* factors lead to that conclusion. Plaintiffs, who are presumed to be the masters of their case, have posited that "[a] factfinder could conceivably assign only 10 percent fault to the Homebuilders," or assign up to "50 percent fault." Dkt. No. 123 at 10. Accepting for present purposes that plaintiffs' total recovery would top out at $51.5 million, the Lennar defendants' potential liability would range from $5.15 million to $25.75 million. Consequently, the $6.3 million settlement payment to plaintiffs: (1) exceeds the 10% liability amount by more than $1 million; (2) is roughly 24% of the 50% liability figure; and (3) is 12.2% of the full $51.5 million in the highly unlikely event that the Lennar defendants would be found 100% liable. In the Court's experience, these outcomes are well within the "broad parameters of the 'ballpark' within which settlements will be deemed to be in good faith." *Tech-Bilt*, 38 Cal. 3d at 501 n.9; *see also id.* at 501 (noting with approval *Widson v. Int'l Harvester Co.*, 153 Cal. App. 3d 45 (1984), where a joint tortfeasor's $30,000 settlement was found reasonable in context of worst-case liability ranging from $50,000 (where settlement payment would have been 60%) to $187,500 (16%)). The Tetra Tech defendants have not demonstrated otherwise. For their complaint that this may be rough justice, a good faith settlement "does not call for perfect or even nearly perfect apportionment of liability. In order to encourage settlement, it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages." *Abbott Ford, Inc. v. Superior Court of Los Angeles County*, 43 Cal. 3d 858, 874 (1987). The $6.3 million amount that the Lennar defendants are proposing to pay is not "grossly disproportionate to [their] fair share." *Id.* at 874-75.

      The Tetra Tech defendants did not argue any of the other *Tech-Bilt* factors, such as the way the settlement proceeds are to be allocated among the plaintiffs or indications of collusion or fraud. This is undoubtedly because those factors would provide additional support for a finding of good faith. Also, when the parties are "[r]epresented by knowledgeable counsel, settlement

5

1 negotiators can predict with some assurance whether a settlement is within the reasonable range
2 permitted by the criterion of good faith." *Tech-Bilt*, 38 Cal. 3d at 500.  Here, there are
3 experienced counsel on both sides, and the settlement before the Court was reached as the result of
4 a "mediator's proposal" made by experienced, neutral mediators.  Dkt. No. 201 at 5.

5       The proposed settlement between plaintiffs and the Lennar defendants was entered into in
6 good faith pursuant to CCP Section 877.  A good faith determination is granted in favor of the
7 Lennar defendants.  Dkt. No. 201.

## II. FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the claims of a certified class may be settled only with the Court's approval.  Rule 23(e) outlines the procedures that apply to the proposed class settlement, including the requirement to direct notice in a reasonable manner to all class members who would be bound by the proposal.  Fed. R. Civ. P. 23(e)(1).

Under Rule 23(e)(2), the Court may approve a proposal that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>   (i) the costs, risks, and delay of trial and appeal;
>   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>   (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other."

Fed. R. Civ. P. 23(e)(2).

In addition, our circuit has determined that "[t]he factors in a court's fairness assessment will naturally vary from case to case, but courts generally must weigh: (1) the strength of the

plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

Before turning to the application of these factors here, the Court confirms the certification of the proposed settlement class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Nothing material has changed on this score since preliminary approval. No class member or party has challenged the propriety of the class certification, and the Court certifies a final settlement class of all individuals or entities who purchased or obtained title to one or more units at Parcel A between 2014 and the date on which the Settlement Agreement was executed by all parties. Excluded from the class are defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; class counsel, employees of class counsel's firms, and class counsel's immediate family members; defense counsel, their employees, and their immediate family members; and any judicial officer who considers or renders a decision or ruling in this case, their staff, and their immediate family members. The Court also confirms the appointment of Linda Parker Pennington as class representative, as well as the appointment of Cotchett, Pitre & McCarthy, LLP (CPM) as class counsel.

On the Rule 23(e)(1) notice requirement, the Court approved the parties' notice plan, which included postcard notice, email notice, and a settlement website. Dkt. No. 154. The individual notice efforts reached an impressive 100% of the identified settlement class. Dkt. No. 200-2 ¶ 23. The Court finds that notice was provided in the best practicable manner to class members who will be bound by the proposal. Fed. R. Civ. P. 23(e)(1).

For the Rule 23(e)(2) and *Churchill Village* factors, the class representative and class counsel have adequately served in those roles. Also, the parties attended an all-day mediation in August 2019, and after continuing to exchange settlement proposals, as well as relevant

1    documents and data, accepted a mediator's proposal in February 2020 and finalized the settlement
2    agreement in August 2020. Dkt. No. 200-1 ¶¶ 12-14. The mediation process was assisted by
3    experienced JAMS mediators. *Id*. This record establishes that the settlement agreement was
4    negotiated at arm's length, which weighs in favor of final approval. CPM and counsel for the
5    Lennar defendants did not negotiate over attorney's fees and costs, and the settlement agreement
6    provides that attorney's fees and costs will be paid from the settlement fund at the Court's
7    discretion. *Id*. ¶ 18.

On the adequacy of the relief provided to the class and the proposed treatment of class members relative to each other, the proposed settlement provides for $6.3 million in cash to be paid by the Lennar defendants. The class members will not be required to file a claim or take any further action to receive their share. A settlement check will be sent to each of the 347 units on Parcel A, as well as 27 more checks for the homes that have been re-sold. Dkt. No. 200-1 ¶ 31. Each class member's settlement share will be calculated based on objective data including purchase price, purchase date, whether the class member paid market rate or below market rate for their home, and if they sold their home, the date of sale and price. CPM has engaged a valuation expert who analyzed the comparative damages suffered by the class members, and how the settlement fund balance should be allocated. Dkt. No. 200-4. The proposed allocation is fair and reasonable, and treats class members equitably relative to each other. The payouts will be substantial, ranging from hundreds of dollars, to tens of thousands. *Id*., Ex. B.

Attorney's fees and costs will be paid from the settlement fund, but settlement administration costs (up to $50,000) will not -- that will be paid for separately by the Lennar defendants. Dkt. No. 200-1 ¶ 22 & Ex. A ¶ 27. Uncashed amounts will either be redistributed to the class or distributed to the Shipyard Trust for the Arts as a *cy pres* beneficiary. Dkt. No. 200-1, Ex. A at 10-11. In this case brought by homeowners in the Shipyard, the Court finds that the proposed *cy pres* distribution sufficiently "bears a substantial nexus to the interests of the class members." *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012).

The Court finds that, on this record, the relief provided by the settlement is adequate and fair. The Court has already determined the $6.3 million to be paid by the Lennar defendants is "in

the ballpark" of what can be said to be their fair share of plaintiffs' total recovery. *See supra*. Plaintiffs faced other litigation risks as well, such as the possibility that they would have to arbitrate their claims on an individual basis and not be permitted to proceed as a class at all. Dkt. No. 200 at 6-7. Judging the adequacy of the payout to a class is "an amalgam of delicate balancing, gross approximations and rough justice," *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), and this settlement amply passes that test.

The reaction of class members resoundingly favors final approval. With 100% of the class members receiving notice, there have been no objections and no requests to opt out. Dkt. No. 200 at 1. This is an impressively positive response. The eight individuals who are affiliated with the Lennar defendants will be excluded for that reason. Dkt. No. 207.

Final approval of the proposed class action settlement is granted.

## III. ATTORNEYS' FEES

When awarding fees in a common fund case like this one, the Court has "discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth*, 654 F.3d at 942. The choice between lodestar and percentage calculation depends on the circumstances, and "in common fund cases, [there is] no presumption in favor of either the percentage or the lodestar method." *In re Washington Public Power Supply Sys. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994).

Class counsel has asked for $1,494,135 in fees. Dkt. No. 175. Counsel says this is 23.7 percent of the settlement fund, which is within the 25 percent benchmark in our circuit. *Id*. at 10. Counsel further states that the requested fee is reasonable under the lodestar method as well because the lodestar is approximately $4,317,112, and so the requested $1.494 million in fees work out to a multiplier of negative 0.346. *Id*. at 11.

A request of 23.7 percent of the settlement fund is well within bounds in this case. Class counsel brought skill, dedication, and hard work to this case and their clients, and they have obtained a very good result early in the litigation. In addition, counsel has provided detailed descriptions and breakdowns of the 11,751 hours CPM spent on this case by timekeeper, category of work, and number of hours. Dkt. Nos. 175 & 175-1. Counsel took the extra step of

1   determining which of those hours were spent on "issues and tasks unique to the litigation against
2   Tetra Tech that did not directly benefit the class members in the instant settlement" and excluded
3   those hours, leaving 10,145 hours spent on this litigation, which were additionally broken down
4   into "seven different work codes." Dkt. No. 175-1 ¶ 12. The Court finds that the hours expended
5   and hourly rates used were reasonable, and further notes that CPM took the case on a contingent
6   fee basis, Dkt. No. 175-2 ¶ 8, taking on a substantial amount of risk. CPM's fee request is further
7   supported by the additional work done and hours incurred by two other plaintiffs' firms that
8   assisted with the case, Dkt. Nos. 175-3 & 175-4, with whom CPM will split the fees.
9       The request for $1,494,135 in fees is granted.

**IV.   COSTS**

Class counsel has also requested reimbursement of expenses in the amount of $323,461. Dkt. No. 175. The bulk of those costs were for mediation, expert witnesses and consultants, and for document repository fees. Dkt. No. 175-1, Ex. 2. That is a reasonable amount given the litigation activity that has taken place in this case, and the expenses have reasonably been explained and documented in the declarations of counsel. The requested reimbursement is granted.

**CONCLUSION**

The proposed settlement between plaintiffs and the Lennar defendants is approved as a good faith settlement pursuant to California Code of Civil Procedure Section 877, and final approval of the class action settlement is granted under Federal Rule of Civil Procedure 23(e). The following eight persons are excluded from the settlement class because of their affiliation with the Lennar defendants: Kofi Sampaney Bonner; Kofi Sampaney Nigel Bonner; Kofi S. Bonner; Noelle A. Bonner; Gladys Moore; Gladys Edna Moore; Brian Christopher Walsh; and Edward John Walsh.

Lead class counsel and the settlement administrator Epiq are directed to distribute the settlement shares to class members consistent with the terms of Exhibit B to the Reynolds declaration, Dkt. No. 200-4. Any checks that remain uncashed after 180 days will be voided and

re-distributed to class members or allocated to the *cy pres* recipient, the Shipyard Trust for the Arts.

Class counsel is awarded $1,494,135 in attorney's fees, and ordered reimbursed $323,461 in litigation expenses. Counsel will file a post-distribution accounting as required by the Northern District's Procedural Guidance for Class Action Settlements.

Pursuant to Federal Rules of Civil Procedure 54(a) and (b), final judgments of dismissals with prejudice will be entered for the Lennar defendants, in accordance with the settlement agreement. The parties are directed to file proposed judgments.

**IT IS SO ORDERED.**

Dated: March 28, 2022

JAMES DONATO
United States District Judge