1  WILMER CUTLER PICKERING
    HALE AND DORR LLP
2  DAVINA PUJARI, SBN 183407
   davina.pujari@wilmerhale.com
3  CHRISTOPHER A. RHEINHEIMER, SBN 253890
   chris.rheinheimer@wilmerhale.com
4  1 Front Street, Suite 3500
   San Francisco, California 94111
5  Telephone:     (628) 235-1002
   Facsimile:     (628) 235-1001
6
7  CHRISTOPHER T. CASAMASSIMA, SBN 211280
   chris.casamassima@wilmerhale.com
8  350 South Grand Avenue, Suite 2400
   Los Angeles, CA 90071
9  Telephone:     (213) 443-5300
   Facsimile:     (213) 443-5400
10
11 MICHAEL J. BROWN, Admitted *Pro Hac Vice*
   mike.brown@wilmerhale.com
12 60 State Street, Boston MA 02109
   Telephone:     (617) 526-6310
13 Facsimile:     (617) 526-5000
14
   Attorneys for Defendants
15 TETRA TECH, INC., TETRA TECH EC, INC.
   and ANDREW BOLT
16

17              **UNITED STATES DISTRICT COURT**

18             **NORTHERN DISTRICT OF CALIFORNIA**

19

20 LINDA PARKER PENNINGTON, et al.,        Case No. 3:18-cv-05330-JD

21            Plaintiffs,                  Related To: Case No. 3:19-cv-07510-JD
                                                       Case No. 3:19-cv-01417-JD
22       v.
                                          **DEFENDANTS' OPPOSITION TO**
23 TETRA TECH EC, INC., et al.,           **MOTION FOR CLASS CERTIFICATION**

24            Defendants.                  Date: November 16, 2023
                                          Time: 10:00 am
25                                        Courtroom: 11
                                          Judge: Hon. James A. Donato
26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ..........................1

II.     STATEMENT OF FACTS .................................................................................................2

      A.      The History of HPNS ...........................................................................................2

      B.      The Shipyard Development ...................................................................................4

      C.      Procedural History................................................................................................4

      D.      Plaintiffs' Proposed Class ....................................................................................6

III.    STANDARD OF REVIEW ...............................................................................................8

IV.     ARGUMENT .....................................................................................................................8

      A.      Plaintiffs Fail to Meet the Requirements of Rule 23(a) .......................................9

            1.      The Elements of Plaintiffs' Claims Turn on Individual Questions...............9

                  a.      The Fraud and Negligent Misrepresentation Claims Are Not Subject to Common Proof ............................................................9

                  b.      The Statutory Fraud Claims Are Not Subject to Common Proof .............................................................................................12

                  c.      Nuisance Claims Fail And Are Not Subject To Common Proof .............................................................................................13

                  d.      Negligence Claims Are Not Subject to Common Proof .................16

            2.      Plaintiffs Cannot Demonstrate Ms. Pennington's Claims Are Typical Of The Class Members' Or That She Is An Adequate Representative ...............................................................................................19

      B.      Plaintiffs Cannot Demonstrate Predominance or Superiority ...............................21

            1.      Plaintiffs' Claims Do Not Present Common Questions That Predominate Over Individual Issues .............................................................21

            2.      Plaintiffs Do Not Have A Viable Damages Model .....................................22

            3.      Plaintiffs Cannot Demonstrate Superiority ...................................................24

V.      CERTIFICATION OF CERTAIN ISSUES IS NOT PROPER ..........................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) ............................................................ 19, 20

*In re Arris Cable Modem Consumer Litig.*,
   327 F.R.D. 334 (N.D. Cal. 2018) ............................................................ 13

*Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc.*,
   2016 WL 3519294 (E.D. Cal. June 27, 2016) ........................................ 10

*In re Bungay*,
   860 F.2d 1088 (9th Cir. 1988) ................................................................ 22

*Cholakyan v. Mercedes-Benz, USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ........................................................... 15

*In re Clorox Consumer Litig.*,
   301 F.R.D. 436 (N.D. Cal. 2014) ........................................................... 12

*Colman v. Theranos, Inc.*,
   325 F.R.D. 629 (N.D. Cal. 2018) ........................................................... 10, 12

*Comcast v. Behrend*,
   569 U.S. 27 (2013) .................................................................................. 22

*Davidson v. O'Reilly Auto Enters., LLC*,
   968 F.3d 955 (9th Cir. 2020) .................................................................. 9

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................. 9, 17

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
   326 F.R.D. 592 (N.D. Cal. 2018) ........................................................... 13

*Georgine v. Amchen Prods., Inc.*,
   83 F.3d 610 (3rd Cir. 1996) .................................................................... 25

*Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F.Supp.2d 888, 901
   (N.D. Cal. 2011) ..................................................................................... 13

*Jordan v. Paul Fin., LLC*,
   285 F.R.D. 435 (N.D. Cal. 2012) ........................................................... 12

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   609 F. Supp. 3d 942 (N.D. Cal. 2022) ................................................... 12

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*LaBauve v. Olin Corp.*,
    231 F.R.D. 632 (S.D. Ala. 2005)............................................................................. 10, 16, 22, 25

*Lee-Bolton v. Koppers Inc.*,
    319 F.R.D. 346 (N.D. Fla. 2017).................................................................................................. 21

*Lincoln Alameda Creek v. Cooper Indus., Inc.*,
    829 F. Supp. 325 (N.D. Cal. 1992) ............................................................................................. 16

*McCool v. Wilson*,
    2020 WL 7223252 (C.D. Cal. Oct. 28, 2020) .............................................................................. 9

*Milan v. Clif Bar & Co.*,
    340 F.R.D. 591 (N.D. Cal. 2021) ....................................................................................... 8, 21, 22

*Miller v. Fuhu, Inc.*,
    2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) .............................................................................. 12

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020)..................................................................................................... 13

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982)................................................................................................. 15, 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)...................................................................................................... 8, 9

*Orange Cnty. Water Dist. v. Unocal Corp.*,
    2016 WL 11201024 (C.D. Cal. Nov. 3, 2016) ........................................................................... 16

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014)......................................................................................................... 9

*Pettit v. Procter & Gamble Co.*,
    2017 WL 3310692 (N.D. Cal. Aug. 3, 2017).............................................................................. 13

*Prantil v. Arkema France S.A.*,
    2022 WL 1570022 (S.D. Tex. May 18, 2022) ............................................................................ 15

*Roley v. Google LLC*,
    2020 WL 8675968 (N.D. Cal. July 20, 2020)............................................................................. 12

*Sandoval v. PharmaCare US, Inc.*,
    730 F. App'x 417 (9th Cir. 2018)................................................................................................ 20

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020)....................................................................................................... 12

*Tetra Tech EC, Inc. v. CH2M Hill Inc.*,
    No. 20-cv-04704, ECF 91 (N.D. Cal. Jan. 27, 2022) ................................................................. 16

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ................................................................. 13

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020) ........................................ 8

*Zeiger v. WellPet LLC*,
  526 F. Supp. 3d 652 (N.D. Cal. 2021) .................................................. 13

**State Cases**

*Beacon Residential Cmty. Ass'n. v. Skidmore, Owings & Merrill LLP*,
  59 Cal. 4th 568 (2014) .......................................................................... 16

*Kwikset Corp. v. Superior Court.*,
  51 Cal. 4th 310 (2011) .......................................................................... 12

*Mendez v. Rancho Valencia Resort Partners, LLC*,
  3 Cal. App. 5th 248 (2016) ................................................................... 15

*Potter v. Firestone Tire & Rubber*,
  6 Cal. 4th 965 (1993) ............................................................................ 25

*Santa Fe P'ship v. ARCO Prods. Co.*,
  46 Cal. App. 4th 967 (1996) ................................................................. 16

*Stout v. Turney*,
  22 Cal. 3d 718 (1978) ............................................................................ 21

**Other Authorities**

Federal Rule of Civil Procedure 23 .................................................. *passim*

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

Five years into this litigation, Plaintiffs now redefine the purported class by arbitrarily picking a date on which a putative class member must have owned a Shipyard unit to be included in the class. This change excludes individuals who were previously included in the class definition, and in the settlement class approved by this Court in connection with Plaintiffs' settlement with the "Lennar Defendants" (as defined at ECF 224). And this change, which presents its own inherent problems, still does not make the class certifiable for trial. No matter the revision to the proposed class, Plaintiffs cannot change the fact that proving common law fraud, California statutory fraud, negligence, and nuisance here would require overwhelming questions of individualized proof that preclude class certification.

Plaintiffs seek to certify a class of "*all individuals or entities who held title to one or more market-rate units on Parcel A at the Shipyard in San Francisco on August 2, 2018*," to bring claims against Tetra Tech Inc., Tetra Tech EC, Inc. ("TtEC"), and Andrew Bolt ("Tetra Tech Defendants") for unrealized profits in the form of home appreciation impairment. Some Plaintiffs, but not all, also seek damages for fear of developing cancer. The root cause of their alleged harm is contamination at Hunters Point Naval Shipyard ("Hunters Point" or "HPNS") caused by the Navy. Plaintiffs claim that allegations of fraud against the Tetra Tech Defendants in connection with TtEC's effort to remediate that contamination adversely impacted their home values.

Plaintiffs fall well short of their burden for certifying a class. To prove their claims, class members must rely on evidence based on, *inter alia*, what types of homes they purchased, what they used those homes for, and when between 2014 and 2018 they bought. Plaintiffs fail to satisfy the commonality, typicality, and adequacy of representation requirements of Rule 23(a). Plaintiffs fail to satisfy Rule 23(b)(3) because individualized questions at trial will predominate over common ones, they do not advance any reliable method for assessing class-wide injury, and the inevitable need for individual trials will undermine any efficiency gained from proceeding as a class. For each of the reasons addressed herein and in Defendants' contemporaneously filed Motion to Exclude, Motions for Summary Judgment, and Motion on the Pleadings, Plaintiffs' Motion for Class Certification (ECF 265) should be denied.

## II.   STATEMENT OF FACTS

### A.   The History of HPNS

From approximately 1940 to 1974, the Navy used HPNS as a base to conduct ship repair, radiological research, and to decontaminate radiologically-impacted ships. Ex. A at 1.[1] The Navy's activities on some parcels at HPNS contaminated the site. Ex. B. The EPA designated HPNS a Superfund site in 1989. Ex. A at 1. In March of 1999, the San Francisco Redevelopment Agency ("SFRA")[2] selected Lennar as a developer to transition the land from naval base to commercial property. Ex. C at 2. In 2002, the Navy hired TtEC to perform an environmental investigation and remediate contamination in certain areas. *See* ECF 157 ¶ 160. TtEC "did not do any radiological work at Parcel A except at Building 322, which was demolished and removed many years ago." Ex. D at 1. In 2004, the Navy "determined there was no radiological contamination present at Parcel A" and issued a finding that Parcel A was safe and transferred the land to the City and County of San Francisco. Ex. A at 3. In April 2005, San Francisco transferred Parcel A to Lennar. Ex. E at 1.

In October 2012, as part of its oversight of TtEC's work, the Navy's Radiological Affairs Support Office identified anomalies in certain soil sample data submitted by TtEC. Ex. F at ES-1. None of the alleged anomalies originated in Parcel A. *Id*. In response to the discovery, TtEC undertook an investigation. *Id*. The next year, Lennar broke ground on its development in Parcel A—starting construction on what would be the Shipyard Development ("Shipyard") where the purported class members eventually purchased their units. *See* ECF 157 ¶ 200. In June 2014, Lennar started selling those Shipyard units. *Id*. In April 2014, TtEC produced a report, after incorporating the Navy's review and comments, that described TtEC's re-sampling of impacted survey units and outlined corrective actions, including employee discipline, training, and additional quality control measures. Ex. F. at ES-1—ES-3. TtEC also identified and disciplined the employees connected to the suspicious sampling, and two employees later pleaded guilty to

---

[1] All exhibits are attached to the declaration of Michael J. Brown.

[2] The San Francisco Redevelopment Agency was a state-authorized redevelopment agency that was dissolved in February 2012 and has since been succeeded by the San Francisco Office of Community Investment and Infrastructure ("OCII").

falsifying records. *Id*. at 10, 19. In 2014, the Nuclear Regulatory Commission ("NRC")

investigated and concluded that two TtEC employees falsified soil sample data. Ex. G at 1. On

October 13, 2014, TtEC's report was disseminated, resulting in significant press coverage. In an

article by NBC titled *Contractor Submitted False Radiation Data at Hunters Point*, NBC reported

that TtEC "admitted…that it mishandled soil samples and submitted false data" and that the "Tetra

Tech report add[ed] to mounting concerns that the remediation of the shipyard has been botched

and that the health of future residents is at risk." Ex. H at 2. This was the first in a series of stories

about purported contamination remaining at Hunters Point. *See, e.g.*, Exs. H-I, K, M-P.

In 2016, the Navy began a comprehensive review of all HPNS soil sample data submitted

by TtEC with oversight from the EPA and California Department of Toxic Substances Control.

*See* Ex. I at 2-3. The Navy's efforts were widely shared with the Shipyard community and

reported by the media. As reflected in 2016 meeting minutes between stakeholders, including

government agencies, environmental consultants, and developers, "EPA and City of San Francisco

representatives expressed the community is very interested in being informed and involved

throughout the duration" of the investigation and cleanup, and recommended a plan to keep

citizens apprised in five different languages. Ex. J at 3. Following the Navy's review, press

coverage regarding concerns with contamination at HPNS continued, and throughout 2016 was

extensive. For example, on March 10, 2016, NBC Bay Area detailed an interview with Anthony

Smith, a radiation control technician who was identified in TtEC's 2014 report as connected to the

anomalous samples, in an article titled "*Former Hunters Point Worker Claims Supervisors

Ordered Him to Hide Radiation*." Ex. K. On July 28, 2016, the NRC issued a letter to TtEC

proposing a civil penalty in response to its prior conclusion that "two Tetra Tech employees

deliberately falsified soil sample surveys." Ex. L at 1-3. On July 29, 2016, NBC Bay Area

reported on the NRC's finding in an article titled "*Feds Propose Fine Against Hunters Point

Contractor.*" Ex. M. On September 3, 2016, The San Francisco Chronicle published an article

titled, "*Future Stalled while Shipyard Cleanup Drags On*." Ex. N. On September 16, 2016,

Greenaction for Health and Environmental Justice Clean Air Alliance issued a press release

regarding "Tetra Tech's Falsification Of Radioactive Soil Samples" and "possible illegal dumping

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

of radioactive soils by the US Navy's contractor Tetra Tech." Ex. O at 1. And on September 22, 2016, Hoodline published the article "*Hunters Point Shipyard Land Transfers On Hold As Toxic Waste Cleanup Investigated,*" reporting on "the extent of the falsification of data about the cleanup of toxic and radioactive materials at the site …." Ex. P at 1.

Then, on October 10, 2016, Lennar wrote directly to existing Shipyard residents to acknowledge "news reports … about a pending investigation of a Navy contractor involved in the cleanup of some parcels located at The San Francisco Shipyard." Ex. Q. Lennar also provided this notice to some potential buyers, although it is not clear whether every buyer received it. *See* Ex. R, Yang Tr. 122:15-16 ("Fammie [Pham] gave me this before I closed, because I inquired about the safety."). Continuing into 2017, on February 8, NBC Bay Area published an article titled "*Navy Launches Investigation into Cleanup of Hunters Point Shipyard Following NBC Bay Area Reports,*" continuing NBC's series that began in 2014 on the HPNS remediation. Ex. I. On April 7, 2017, Defendant Five Point disclosed "allegations that a contractor hired by the U.S. Navy misrepresented the scope of its remediation work" at HPNS, and the potential financial impact of a delay in transfers, in a public SEC filing. Ex. S at 27, Form S-11.

## B. The Shipyard Development

The Shipyard units in question—condominiums and townhomes developed by Lennar—sit on what was Parcel A of HPNS. Parcel A was never used for radiological testing, and numerous studies confirm that Parcel A is safe. *See, e.g.,* Ex. A at 3; Ex. D at 1; Ex. T at 532 (October 25, 2022 Radiological Risk Assessment finding that "there is no unacceptable incremental cancer risk to those working on the HPNS site and those living nearby" is "supported by a series of studies recently conducted by the CDPH and the San Francisco Department of Public Health" finding "no radiation or health and safety risk to residents or tenants of Parcel A-1…") (citations omitted). Of the 241 units owned by putative class members (ECF 265 at 1), 62 were sold before 2016, 66 were sold in 2016 in the midst of the extensive press coverage described *supra*, and 113 units were sold even later, between January 1, 2017, and August 1, 2018. *See* Ex. U.

## C. Procedural History

On April 16, 2021, Ms. Pennington and other named Plaintiffs filed their Consolidated

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Third Amended Complaint ("Complaint"). ECF 157. Plaintiffs sought relief from the Tetra Tech Defendants and the Lennar Defendants for purported "damages to their properties, including but not limited to the purchase price and/or the decrease in value of the properties." *Id.* at 87. Plaintiffs entered into a class settlement with the Lennar Defendants only, which was approved by the Court. ECF 224 at 2, 11. That class was defined as "*all individuals or entities who purchased or obtained title to one or more units at Parcel A between 2014 and the date on which the Settlement Agreement was executed by all parties [Aug. 10, 2020].*" *Id.* at 7. Plaintiffs now seek to narrow the proposed class to: "*All individuals or entities who held title to one or more market-rate units on Parcel A at the Shipyard in San Francisco on August 2, 2018.*" ECF 265 at 1. This new class definition excludes anyone who sold before, or bought after, August 2, 2018, including named Plaintiffs and numerous settlement class members. Ex. V at 3, 8; Ex. W at 3, 8.

Plaintiffs filed their Motion for Class Certification on June 16, 2023. ECF 265. With their Motion, Plaintiffs submitted a declaration from appraiser Brett Reynolds (ECF 265-17), on whom they rely for justification of the narrowed class definition, for proof of causation of their negligence and nuisance claims, and to show that damages can be proven on a class-wide basis. ECF 265 at 6, 12, 14, 19. The Tetra Tech Defendants deposed Mr. Reynolds on July 27, 2023. As explained more fully in the contemporaneously filed Motion to Exclude, Mr. Reynolds testified that he was unaware of the respective class definitions (Ex. X, Reynolds Tr. at 109:18-110:20); that his analysis was focused on reporting of contamination rather than of alleged fraud (*id.* at 19:25-20:2; 51:16-52:21; 94:15-20; 148:12-19); that he lacks any expertise to accurately determine the notoriety of press coverage at a given time (*id.* at 61:18-62:14; 66:14-25); that he determined the August 2, 2018, date in coordination with class counsel after "a couple hours of Googling" (*id.* at 58:19-59:12; 59:23-61:17; 62:15-63:7; 67:14-68:11; 96:14-18); that the index he uses as a benchmark for appreciation is unrepresentative of the Shipyard properties (*id.* at 68:12-69:9; 37:14-24; 42:13-24; 43:5-9; 43:14-22; 69:20-74:22; 75:5-20; 51:7-10; 39:3-6); that he did not evaluate other potential causes of appreciation impairment (*id.* at 54:14-23; 149:2-150:3); and that his damages model includes amounts for non-class members and contains mathematical errors (*id.* at 98:15-22; 122:21-123:7; 146:14-147:6). His declaration comes nowhere close to being

reliable. Plaintiffs cannot rely on it to establish any aspect of class certification.

Concurrently, the Tetra Tech Defendants are filing a Motion to Exclude Mr. Reynolds' declaration. The Tetra Tech Defendants are also filing Motions for Summary Judgment on Plaintiffs' nuisance claims, a Motion for Partial Summary Judgment on certain Plaintiffs' requests for lost profits under their fraud and misrepresentation claims, and a Motion for Judgment on the Pleadings on Plaintiffs' UCL claims.

**D.      Plaintiffs' Proposed Class**

Plaintiffs seek to certify a class for negligence, nuisance, common law fraud, and California statutory fraud claims. ECF 265 at 1. For each claim, class members allege they "suffer real property damages because their home values are not appreciating at the same rate as comparable homes throughout the San Francisco Bay Area." *Id.* They claim that individuals who bought at the Shipyard prior to 2018 were unaware of negative press reporting of contamination of the Shipyard and alleged fraud by the Tetra Tech Defendants. *Id.* But once news of the allegations became "widely publicized," purportedly in August of 2018, Plaintiffs argue that homeowners were deprived of the gain on investment they anticipated when they bought their units. *Id.* Some, but not all, of the Plaintiffs also seek damages for fear of developing cancer. *Id.* at 6, 19.

Plaintiffs' contentions essentially ignore the pre-2018 press coverage described *supra*. And Plaintiffs disregard that they and the putative class members knew the Shipyard was adjacent to a Superfund site, which has an undeniable effect on the value and appreciation of their properties. *See* ECF 157 ¶ 5. Proposed Class Representative Ms. Pennington acknowledged that the disclosure provided to her by the Lennar Defendants in 2015 disclosed that HPNS was a Superfund site, that the Navy was engaged in remedial actions, and that these efforts were supervised by the EPA and state regulatory agencies. Ex. Y, Pennington Tr. at 222:20-224:22.

Mr. Coussa, who also purchased in 2015, testified he "knew [HPNS was] a Superfund [site] and there was a massive amount of clean up that had to happen over the few decades before it was handed over for development." Ex. Z, Coussa Tr. at 24:18-21. He explained that before buying, this "was something that gave us pause" and that he "definitely wanted to investigate a bit more" but that when "reassured by Lennar…in a very, very persuasive way that it was… clean and

6                                   Case No. 3:18-cv-05330-JD

there were no issues … that's why we signed." *Id*. at 24:22-25:2. When asked if he thinks the proximity to a Superfund site affected the offering price of homes in the Shipyard, Coussa replied, "[y]es, I think it definitely had an effect on…prices." *Id.* at 32:24-33:4.

Ms. Yang testified that she was aware that the Shipyard was adjacent to a Superfund site around "September or October of 2016," months "before [she] purchased" the property in late December 2016. Ex. R, Yang Tr. at 25:4-26:1, 100:3-9. She "heard about it through Lennar, actually, and also some news articles." *Id*. at 25:4-13. Yang admitted that home values in the Shipyard were already impacted by media coverage in early 2017. *Id.* at 24:3-17.

The price of the condominiums and townhomes putative class members purchased differed based on a number of characteristics, including which of the different Lennar sub-developments they are housed in, whether they have Bay views, square footage and number of rooms and bathrooms, whether they have outdoor space, and how modern the amenities are. Ex. R, Yang Tr. at 64:12-16; Ex. AA, Choi Tr. at 110:23-111:05 ("It's not exactly comparing apples to apples"). Some proposed class members bought directly from the Lennar Defendants and some did not. *See, e.g.,* Ex. BB at 8; Ex. CC at 8; Ex. DD at 8. Some bought multiple properties. *See, e.g.,* Ex. DD at 8, 10. Some bought for investment purposes or to make money from rentals, and others bought as their primary residence. *See, e.g.,* Ex. R, Yang Tr. at 50:11-25; Ex. AA, Choi Tr. at 46:15-17; Ex. Z, Coussa Tr. at 20:15-25. Some of the proposed class members have since sold their homes, and others remain in the Shipyard. *See* Ex. AA, Choi Tr. at 71:11-13; Ex. Y, Pennington Tr. at 145:8-15. Some proposed class members were able to sell their home for a profit, and others sold at a loss. *See* Ex. X, Reynolds Tr. at 104:13-23; Ex. AA, Choi Tr. at 90:20-91:18; Ex. Z, Coussa Tr. at 21:19-22:4, 39:8-17. Some Plaintiffs claim they were unable to secure financing for a period of time and other Plaintiffs had no issues. *See* Ex. R, Yang Tr. at 84:15-89:17; Ex. AA, Choi Tr. at 100:14-16. In fact, Lennar New Home Consultant Fammie Pham testified that the impact of news reports regarding the Tetra Tech Defendants may have impacted financing at the Shipyard for only a couple months—not years, and not permanently. Ex. EE, Pham Tr. at 71:23-73:8, 186:19-22. Finally, some putative Class Members claim a fear of developing cancer and others do not. *See, e.g.*, Ex. AA, Choi Tr. at 116:24-117:16 ("[C]ompared with other residents there, [fear of

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

cancer]'s not as top of mind for me … [i]t's just something that I'm not thinking about.").

## III.     STANDARD OF REVIEW

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 and must carry their burden of proof before class certification" by a "preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (quotations omitted). Rule 23(a) provides that a district court may certify a class only if plaintiffs show: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *1-2 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir. June 27, 2022). If all four prerequisites of Rule 23(a) are satisfied, plaintiffs must also demonstrate that the action is maintainable under one of the three subsections of Rule 23(b). *Id.* Plaintiffs rely on 23(b)(3): whether "questions of law or fact common to class members predominate over any questions affecting only individual members," and whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at *2, *6. While Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement can be reviewed in tandem, doing so requires "a careful eye toward ensuring that the specific requirements of each are fully satisfied" because "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 598 (N.D. Cal. 2021) (Donato, J.).

## IV.     ARGUMENT

In Section A below, the Tetra Tech Defendants explain why each of Plaintiffs' claims consists of individualized questions that "drive the resolution of the litigation" (*id.*), and why Plaintiffs do not satisfy the adequacy or typicality requirements of Rule 23(a). In Section B, the Tetra Tech Defendants explain why, under Rule 23(b)(3), Plaintiffs do not demonstrate predominance, and why a class action is not a superior vehicle for resolving these claims.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

### A.    Plaintiffs Fail to Meet the Requirements of Rule 23(a)

#### 1.    The Elements of Plaintiffs' Claims Turn on Individual Questions

Plaintiffs have the burden of proving common questions of fact and law among the class for each claim. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). A common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Olean*, 31 F.4th at 663. By contrast, a question is individual in nature when it requires the consideration of evidence that varies from member to member. *Id.* "[I]n all class actions, commonality cannot be determined without a precise understanding of the nature of the underlying claims." *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014). To "establish commonality," a plaintiff must prove a shared injury among class members tied to a specific cause of action. *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 968 (9th Cir. 2020).

In determining whether to certify a class on a particular claim, a court "*must* consider the merits" of that claim and whether there is proof common among the class. *Ellis v. Costco*, 657 F.3d 970, 981 (9th Cir. 2011). Several of Plaintiffs' claims should be dismissed now, and class resolution for any of their claims would be improper because home purchasers are disparately situated—requiring individualized evidence and analyses of unique facts related to each purchase, the extent of relevant media coverage and each class member's level of awareness of it, each unit's unique physical features, the date of each purchase, and whether a Plaintiff purchased their unit for residential or investment purposes. For each claim, discussed individually *infra*, Plaintiffs fail to meet their burden to show the required elements can be proven with common evidence.

#### a.    The Fraud and Negligent Misrepresentation Claims Are Not Subject to Common Proof

Plaintiffs cannot show that their common law fraud and negligent misrepresentation claims can be asserted at all, let alone with common evidence. Fraud requires proof of: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *McCool v. Wilson*, 2020 WL 7223252, at *8 (C.D. Cal. Oct. 28, 2020). The elements for

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

negligent misrepresentation are the same, except that only negligence is required rather than knowledge of falsity. *Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc.*, 2016 WL 3519294, at *3 (E.D. Cal. June 27, 2016). Plaintiffs fail to identify any false statements made by the Tetra Tech Defendants to Plaintiffs, and cannot demonstrate reliance through classwide proof.

Plaintiffs make no attempt to show that any false statements were made *by the Tetra Tech Defendants* to Plaintiffs. In their Motion, Plaintiffs refer only to unnamed "statements" and "the existence of misrepresentations and omissions in Tetra Tech's remediation activities" without pointing to any individual statement by the Tetra Tech Defendants. ECF 265 at 15. While Lennar may have made statements to Plaintiffs during the home-buying process, the Tetra Tech Defendants made none. This alone is dispositive.

If Plaintiffs now contend some class members may have actually relied on some statement by the Tetra Tech Defendants, the Court still should not certify fraud or negligent misrepresentation claims. "By its nature, reliance is an individualized inquiry that demands individualized proof" except in limited circumstances inapplicable here. *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 641 (N.D. Cal. 2018); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) (holding class certification inappropriate where "different plaintiffs will almost certainly have become aware of different representations at different times (if ever), and will have reacted differently to such awareness"). This makes fraud claims "unsuited for treatment as a class action if there was a material variation in the representations made or in the kinds or degrees of reliance to the persons to whom they were addressed." Fed. R. Civ. P. 23(b)(3) advisory committee's note. Plaintiffs' make no real effort to show otherwise, relying only on the conclusory and unsupported assertion that "Tetra Tech's affirmative and intentional misrepresentations about its clean-up efforts were made to the public, affecting the class equally." ECF 265 at 15.

Despite Plaintiffs' conclusory rhetoric, the actual evidence conclusively shows that named Plaintiffs, including the class representative, did not rely on any statement made by the Tetra Tech Defendants in purchasing their units, and they are not entitled to a presumption of reliance to the contrary. The class representative, Ms. Pennington, testified that she "personally didn't rely on any statements by Tetra Tech" when purchasing her home. Ex. Y, Pennington Tr. at 208:10-13. Every

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1   other Plaintiff who was asked this question answered similarly. *See* Ex. AA, Choi Tr. at 122:24-

2   123:7 (Q. You did not rely on any representation made by Tetra Tech in connection with … your

3   property at the shipyard; is that right? A. That's correct. Q. Okay. And are you aware of any

4   representations from Tetra Tech to anyone regarding the Hunter's Point Naval Shipyard prior to

5   the purchase of your property? A. Not that I'm aware of."); Ex. Z, Coussa Tr. at 26:21-23 (Q. …

6   you don't recall any communications from Tetra Tech, right? A. No.); Ex. R, Yang Tr. at 54:24-

7   57:17 (listing Lennar documents Plaintiff Yang relied on).

8        Additional discovery further confirms the variation in what materials purchasers relied on.

9   Plaintiffs' fact sheets submitted in discovery show varying levels of awareness of nearby

10  contamination at the time of purchase. Some buyers did their own research. *See* Ex. FF at 17

11  (Elisa-Maria Torres "[i]n May 2016 … did [her] own research into the issues surrounding the

12  Shipyard and its construction"); Ex. GG at 17 (Brian Yee has feared he may develop cancer from

13  "the potential exposure" of living at the Shipyard "since [he] moved in"). Others claim they

14  developed fear based on news stories that span a period of years from "2016" (Ex. HH at 17), to

15  "Feb 2017 when the news broke out" (Ex. II at 17), to May 2017 (Ex. JJ at 17).

16       Plaintiffs' interrogatory responses, deposition testimony, and documents likewise show the

17  individualized nature of reliance, and the absence of reliance on any Tetra Tech Defendants'

18  statements. Some Plaintiffs, like Linda and Greg Pennington, state they relied on a host of

19  documents, including "An Aerial Radiological Survey of the California Bay Area" published by

20  the Department of Homeland Security. Ex. KK at 5-6; Ex. OO. Other Plaintiffs, like Ms. Yang,

21  saw news articles as early as 2016 before closing on their property. Ex. R, Yang Tr. at 136:3-

22  137:3. Lennar and government officials also communicated directly with class members during

23  the homebuying process. *See* Ex. LL at 1. Other Plaintiffs were only aware of contamination via

24  the standard Environmental Disclosure they received from Lennar. The Tetra Tech Defendants

25  have individualized defenses based on the wide spectrum of materials each Plaintiff considered.

26       In the face of this overwhelming evidence, Plaintiffs argue that they should be entitled to a

27  presumption of reliance on an assumption that any statement or omission by the Tetra Tech

28  Defendants must have been material to each buyer. ECF 265 at 16. But that argument is baseless.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Plaintiffs were not customers of the Tetra Tech Defendants, and the Tetra Tech Defendants did not make any representations to them about the quality of the properties they were purchasing. Indeed, courts hold that the presumption of reliance is permissible only in "extraordinary cases of intense, long-term advertising campaigns where exposure is highly likely." *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 642 (N.D. Cal. 2018). It explicitly does *not* apply to the types of evidence that Plaintiffs seek to rely upon here, where "alleged misrepresentations [were] made via press releases, media coverage, and private conversations." *Id.* at 644. Where, like here, a class "is not defined so as to include only members who were exposed to the allegedly misleading material … Plaintiffs are not entitled to a class-wide presumption of reliance." *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 445-46 (N.D. Cal. 2014).

Plaintiffs' cited cases that allow a presumption of reliance are inapposite. In *Jordan v. Paul Financial., LLC*, the Court presumed reliance only because "all class members must have received the same representations with allegedly fraudulent omissions; that is, the representations with misleading omissions must have been uniformly given to class members." *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 465 (N.D. Cal. 2012). And all of Plaintiffs' other cases are false advertising cases holding that, when "there is classwide proof showing" that a company promoted a particular "message" to its customers that was "received by a significant portion of the class members," it is permissible to presume reliance. *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 988 (N.D. Cal. 2022); *See also Miller v. Fuhu, Inc.*, 2015 WL 7776794, at *16 (C.D. Cal. Dec. 1, 2015); *Roley v. Google LLC*, 2020 WL 8675968, at *8 (N.D. Cal. July 20, 2020). The facts in these cases are far different from the facts here, and they are inapplicable.

**b.    The Statutory Fraud Claims Are Not Subject to Common Proof**

Plaintiffs' claims under California's Unfair Competition Law ("UCL")[3] and California's False Advertising Law ("FAL") cannot be certified because Plaintiffs cannot show common statements on which they all relied. "Since the passage of Proposition 64, a plaintiff must allege

---

[3] The UCL claims also fail as described in Tetra Tech's Motion for Judgment on the Pleadings because Plaintiffs never paid money to Tetra Tech, *Kwikset Corp. v. Superior Court.*, 51 Cal. 4th 310, 336 (2011), and recovery is barred where Plaintiffs have another avenue for recovery (such as a different damages claim), *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

**DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

actual reliance in order to have standing to pursue UCL and FAL claims." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020); *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) ("named plaintiffs … must show proof of 'actual reliance' at the certification stage"). This is impossible to do on a class basis when no common statements were made to the class, much less relied on by class members, as is the case here.

The cases that Plaintiffs cite in support of their statutory fraud claims are inapposite because they presume that each class member was exposed to a common set of statements.[4] Plaintiffs' own authority acknowledges that "at some point, the alleged misrepresentations might vary to such a degree to make class-wide determinations impracticable." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 693 (N.D. Cal. 2021).[5] The standard in considering whether reliance can be presumed is "whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Walker*, 953 F.3d at 631. As explained *supra*, that is not the case here, nor do Plaintiffs even allege so.

### c.   Nuisance Claims Fail And Are Not Subject To Common Proof

To maintain a claim for public nuisance, Plaintiffs must prove:

> (1) that Tetra Tech created a condition or permitted a condition to exist that was, among other alternatives, harmful to health, (2) that the condition affected a substantial number of people at the same time, (3) that an ordinary person would be reasonably annoyed or disturbed by the condition, (4) that the seriousness of the harm outweighs the social utility of the defendant's conduct, (5) that Plaintiffs did not consent to Tetra Tech's conduct, (6) that Plaintiffs suffered harm that was different from the type of harm suffered by the general public, and (7) that Tetra Tech's conduct was a substantial factor in causing the plaintiff's harm.

*Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F.Supp.2d 888, 901 (N.D. Cal. 2011). Plaintiffs' nuisance claims fail for the reasons stated in the Tetra Tech Defendants' concurrently-

---

[4] *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018) ("[M]aterial alleged misrepresentations were made here to the entire class…."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 366 (N.D. Cal. 2018) ("[T]he language on the packaging, Defendant's website, and third party retailers' websites [on which plaintiffs' claims were based] was substantially similar."); *Pettit v. Procter & Gamble Co.*, 2017 WL 3310692, at *1 (N.D. Cal. Aug. 3, 2017) (focusing on a single word used as marketing to all customers).

[5] Because there are no statements made by the Tetra Tech Defendants to all Plaintiffs, the reliance on cases discussing a need for a "uniform understanding," ECF 265 at 18, is misplaced.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  filed Motion for Summary Judgment on those claims. As a matter of law, Plaintiffs cannot prove

2  that any of the Tetra Tech Defendants caused a nuisance, possessed the land on which a nuisance

3  occurred, or leased the land to a party who caused a nuisance, and Plaintiffs are not entitled to

4  nuisance damages in the form of appreciation impairment.

5  Beyond those gating issues, Plaintiffs' nuisance claims present individualized inquiries that

6  prevent certification. In their Motion, Plaintiffs conclusorily argue "[t]he first four elements all

7  focus on Tetra Tech's conduct, not the circumstances of individual class members, and thus raise

8  purely common issues." *Id*. But Plaintiffs' testimony varies regarding whether there exists a

9  condition harmful to health, and whether any Tetra Tech Defendant's actions were a substantial

10  factor in causing any alleged harm will depend on when buyers purchased their units. Even the

11  named Plaintiffs do not advance a unified theory on the first element of their nuisance claim—

12  whether their health has been harmed by a condition caused by either of the Tetra Tech

13  Defendants. *See supra* 7-8.

14  As to the third element—whether a reasonable person would be annoyed and disturbed—

15  that answer depends on whether that "reasonable person" lives in the Shipyard or not. And a

16  number of the alleged class members either (a) never lived in the Shipyard, or (b) have sold their

17  units or moved away. Ms. Pennington testified that she spends at least half of her time at her home

18  in Sonoma and that she plans to spend an increasing percentage of her time there moving forward.

19  Ex. Y, Pennington Tr. at 102:5-7; 121:23-122:1. Whether there exists harm to her health and

20  whether she is annoyed or disturbed by contamination at Hunters Point is a different inquiry from

21  that of individuals who still live in Shipyard units. 122 of the named Plaintiffs claim they have *no*

22  *physical injury* caused by the contamination at the Shipyard, 26 report they have *no fear* of getting

23  cancer from the contamination in the future, and just six report that their fear of health issues has

24  been substantiated by a health care provider. Brown Decl. ¶ 43. Plaintiff Manda Choi testified that

25  "compared with other residents there, it's not as top of mind for me…[i]t's just something that I'm

26  not thinking about." Ex. AA, Choi Tr. at 116:24-117:16. While Plaintiffs attempt to frame

27  individual questions of harm, annoyance, and disturbance as damages issues, ECF 265 at 19, they

28  are elements for nuisance liability that undermine commonality.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1        As for the fifth prong, consent, Plaintiffs concede that consent hinges on (a) when each

2    individual became aware of the news regarding TtEC; and (b) whether each person understood

3    they were purchasing next to a Superfund site. *Id.* at 13-14. That is an inherently individualized

4    inquiry. Ms. Pennington acknowledged that the disclosure provided to her prior to purchasing her

5    unit in 2015 stated that HPNS was a Superfund site, that the Navy was remediating contamination,

6    and that these efforts were supervised by the EPA and regulatory agencies. Ex. Y, Pennington Tr.

7    at 222:20-224:22. But Mr. Coussa testified that he understood the proximity of HPNS would not

8    be an issue because he was "reassured by Lennar… in a very, very persuasive way that it was…

9    clean and there were no issues … that's why we signed."). Ex. Z, Coussa Tr. at 24:15-25:11.

10   Those are significant differences and exemplify the necessary individualized inquiry.

11       Finally, whether the Tetra Tech Defendants' conduct was a substantial factor in causing

12   harm (prong 7) depends on what factors impacted home values over time. Plaintiffs argue that the

13   substantial factor causation prong "will be shown through, among other things, statistical evidence

14   clearly demonstrating the uniform diminution of value of real estate within Parcel A." ECF 265 at

15   14. But this evidence is ostensibly from Plaintiffs' expert Brett Reynolds, who is wholly

16   unreliable, does not provide statistical analysis, and cannot be used to demonstrate class-wide

17   impact. *See infra*; Mot. to Exclude; Ex. MM, Gibbons Decl. at 3-5. And the facts in the record are

18   already to the contrary. Lennar representative Fannie Pham testified that there were numerous

19   construction delays not attributable to the Tetra Tech Defendants and that the Covid-19 pandemic

20   independently impacted sales. Ex. EE, Pham Tr. at 70:22-71:25; 81:4-82:108. Where multiple

21   factors impacted an alleged harm differently over time, class certification is improper. *In re N.*

22   *Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (where "no

23   single proximate cause applies equally to each potential class member," commonality cannot be

24   established); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 556 (C.D. Cal. 2012)

25   (class certification improper where no evidence adduced that there was a single source of the

26   alleged injuries); *Prantil v. Arkema France S.A.*, 2022 WL 1570022, at *30-31 (S.D. Tex. May 18,

27   2022) (denying certification where "individualized proof" was required to assess an incident's

28   impact on property values).

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Plaintiffs rely on the same arguments for their private nuisance claim, ECF 265 at 14-15, despite the even more individualized inquiry required there. *Mendez v. Rancho Valencia Resort Partners, LLC*, 3 Cal. App. 5th 248, 262 (2016) ("A private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land.") Whether each Plaintiff was able to use or enjoy their property will turn on individualized facts such as whether they ever lived in the unit (or rented it) and when they bought and sold (if they sold at all). *Orange Cnty. Water Dist. v. Unocal Corp.*, 2016 WL 11201024, at *7 (C.D. Cal. Nov. 3, 2016) (collecting cases). And individualized proof of harm is required whether the allegations focus on physical harm or stigma damages. *See Santa Fe P'ship v. ARCO Prods. Co.*, 46 Cal. App. 4th 967, 984 (1996) ("courts have uniformly rejected claims of stigma damages absent evidence the plaintiffs' own property suffered physical injury from the contamination."); *LaBauve*, 231 F.R.D. at 674 (denying class cert in mercury-related toxic tort case because inconvenience, causation, and damages required "considerable individualized showings").

### d.    Negligence Claims Are Not Subject to Common Proof

Plaintiffs cannot show common questions of fact as to the elements of their negligence claim: duty, breach, causation, and injury. *See Beacon Residential Cmty. Ass'n. v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 568 (2014). As for duty, Plaintiffs cursorily declare that "Tetra Tech's duty is susceptible to class-wide proof" because "[i]t had a duty to properly remediate HPNS, to honestly report the results of their testing, and the duty to warn about contamination at the Shipyard." ECF 265 at 12. Plaintiffs offer no support (legally or factually) for the claim that any Tetra Tech Defendant owed a duty to class members. *See Tetra Tech EC, Inc. v. CH2M Hill Inc.*, No. 20-cv-04704, ECF 91 at 1 (N.D. Cal. Jan. 27, 2022) (Donato, J.) (dismissing negligence claim where it was "not plausibly alleged that defendants owed them a duty of any sort"). Unlike Lennar, no Tetra Tech Defendant ever had a contractual relationship with any alleged class member. In the absence of contractual privity, when and whether a duty was created by the nature of TtEC's work is dependent on a number of factors, for example (a) when each Plaintiff purchased their home, (b) the stage of TtEC's work at the time, and (c) whether the Tetra Tech Defendants had already disclosed the investigation of alleged fraud at the time of sale. *See Lincoln*

**DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

*Alameda Creek v. Cooper Indus., Inc.*, 829 F. Supp. 325, 328-29 (N.D. Cal. 1992) (environmental consultant hired by current owner to provide soil and groundwater contamination report owed no automatic legal duty to later buyer of the property).

For breach of duty, Plaintiffs' entire argument consists of two sentences—neither of which clearly articulates what the purported breach was—and is insufficient to meet Plaintiffs' burden. Plaintiffs write that "Tetra Tech breached their duty to warn home buyers about the contamination and to properly remediate HPNS" (ECF 265 at 7) and that proof of breach will "include evidence of Tetra Tech's falsification of remediation data and reports" (*id.* at 12). Whether Plaintiffs are claiming breach from the alleged fraud or the level of contamination (or both) is unclear. *See* Ex. X, Reynolds Tr. at 51:16-52:2 (testifying his opinion "has nothing to do with fraud of Tetra Tech. It's more about the contamination itself…"). But whichever theory they rely on, what was disclosed to the public about the allegations and the contamination differed over time as TtEC and the government completed their investigations. What warnings each homebuyer was privy to and whether or not that constitutes a breach of any duty, will differ depending on when on the timeline from 2014 to 2018 they purchased.

With respect to causation and harm, Plaintiffs rely exclusively on Mr. Reynolds. They contend that "Mr. Reynolds shows that market-rate homes on Parcel A were outperforming the market in 2016 and 2017" and that "[e]verything changed in 2018" because "[a]t the beginning of that year—at the same time the EPA was criticizing Tetra Tech and the Rolfe and Hubbard pleas were unsealed—market-rate homes on Parcel A started lagging behind comparable homes throughout the Bay Area." ECF 265 at 12. But Mr. Reynolds does nothing of the sort.

First, Mr. Reynolds *admits* that causation and harm require individualized proof. For example, he testified that "with each month that goes on after the contamination was discovered or widely publicized, homeowners are getting additional information, additional data points, to then drive their decision going forward," and "that the degree of impairment is not consistent from the onset of the discovery of the contamination through year-to-date." Ex. X, Reynolds Tr. at 105:23-106:8; *id.* at 100:22-24. This testimony alone demonstrates that individualized inquiry is required.

Second, even putting aside Mr. Reynolds' concessions, his methodology is fatally flawed

1   and inadmissible—leaving no way for Plaintiffs to meet their burden of proving causation and

2   harm on a class-wide basis. *See infra*; Mot. to Exclude; Ex. MM, Gibbons Decl. at 3-5; *see also*

3   *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding that the same rigorous

4   standard from *Daubert* is "to be applied when analyzing commonality").  For example, Mr.

5   Reynolds admitted that he arrived at the August 2, 2018, ownership cut-off date on which

6   Plaintiffs' proposed class definition is based with nothing more than "a couple of hours of

7   Googling" and without any expertise in media analytics. Mot. Exclude at 5-6. This date is based

8   on Mr. Reynolds' contention that this was when news related to the Tetra Tech Defendants was

9   "widely reported," ECF 265-17 ¶ 11, but he admitted that "widely reported" is "his own term" and

10  that it is likely someone else could "get a more accurate representation." Mot. to Exclude at 6;

11  Gibbons Decl. ¶ 11. That date is critical to Plaintiffs' ability to show causation and harm because,

12  according to class counsel, "homeowners who purchased after August 2, 2018 … received the

13  benefit of lower purchase prices because of the Tetra Tech scandal." ECF 265-15 ¶ 8. That the

14  August 2, 2018 cutoff date for the class was invented without legitimate basis is fatal because their

15  causation and harm theories hinge on the allegation that "[e]verything changed in 2018." ECF 265

16  at 12; Ex. X, Reynolds Tr. at 94:23-95:3 (admitting that "[w]hat makes the sales impacted is that

17  they were bought from the developer before news of the contamination was widely reported, and

18  then sold into a market that had priced in the contamination").

19  Even more, Mr. Reynolds admitted that picking a uniform date on which to cut off the

20  class definite is *not possible* at all because the analysis changes based on what information was

21  available to buyers "with each month." Ex. X, Reynolds Tr. at 105:23-106:8. This individualized

22  inquiry makes sense—whether each prospective buyer knew and factored in news of the alleged

23  fraud and contamination, or whether they were ignorant and blindsided as Plaintiffs allege, will

24  vary over time and buyer to buyer. As Lennar sales representative Fannie Pham agreed in her

25  deposition, "the market will impact different units differently." Ex. EE, Pham Tr. at 56:14-16.

26  News articles regarding the contamination and allegations of fraud circulated in the press

27  from 2014 to the present. *See, e.g.*, Exs. H-I, K, and M-P. To what extent the market priced in

28  those articles at any given time, and whether a buyer was aware of them, are individualized

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    questions. For example, Ms. Pennington filed her case on July 24, 2018, as did Mr. Ellington (*see*

2    ECF 265-1 ¶ 4)—which is *before* the August 2 date where counsel now argues "everything

3    changed." ECF 265 at 12. In a press release published on July 25, 2018, the Cotchett firm boasted

4    that the lawsuit was "in response to reports of fraud that have cast doubt over an ongoing toxic

5    cleanup at [Hunters Point]" and quoted Ms. Pennington, who stated it was "clear" to her she had a

6    claim "over the last several months." Ex. NN at 1. Their new argument that everything changed on

7    August 2, 2018—after the named Plaintiffs had filed these lawsuits—is not credible.

8            Defining the class by using a cutoff date also creates adversity between those homebuyers

9    who happened to buy before and after the chosen date. The cut-off ignores whether those

10   individuals bought with or without knowledge of the contamination and/or alleged fraud. The

11   August 2 date is improper, and in fact any date chosen within the 2014 to 2020 timeframe and

12   applied to the whole class would be improper for the reasons stated above. *See Dalkon Shield*, 693

13   F.2d at 852 ("Relying in part on [the Advisory Note to Rule 23] and on the inherent obstacles to

14   personal injury class actions, many courts have denied plaintiffs' motions for class certification in

15   mass tort or personal injury actions, especially those alleging negligence by one or more

16   defendants over extended periods.") (collecting cases).[6]

17                    **2.      Plaintiffs Cannot Demonstrate Ms. Pennington's Claims Are Typical
                                Of The Class Members' Or That She Is An Adequate Representative**

18

19           Plaintiffs' motion for class certification additionally fails because the claims of the class

20   representative, Ms. Pennington, are not "typical of the claims or defenses of the class." *In re*

21   *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 309 (N.D. Cal. 2018). Typicality is satisfied

22

23   ―――――――――――――
     [6] Plaintiffs' citation to *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018) is
24   unavailing. The court approved an unopposed settlement class of health plan members whose
     data was stored in the same location during "a data security breach that allegedly occurred
25   sometime between December 10, 2014, and February 4, 2015, and resulted in the electronic theft
     of personally identifiable information and personal health information." *Id.* at 308. Because one
26   event by one actor at one time impacted everyone the same way, the Court held the "negligence
     claims would not get bogged down in the individualized causation issues that sometimes plague
27   products-defect cases." *Id.* at 314. The Tetra Tech Defendants never did one thing on one date to
     all class members—let alone on the date Plaintiffs chose. Plaintiffs' negligence claims present the
28   very individualized causation issues the *Anthem* court recognized bogs down uncertifiable cases.

"when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id*. By contrast, when some class members "may have suffered additional harm" and "may have other claims and remedies available to them and different incentives for how best to pursue their interests," the requirement of typicality is not met. *Sandoval v. PharmaCare US, Inc.*, 730 F. App'x 417, 420 (9th Cir. 2018).

Ms. Pennington purchased her property from HPS1 Block 50, LLC, a subsidiary of Lennar, *see* Ex. Y, Pennington Tr. at 99:18-20, and received disclosures Lennar was using at the time. Other class members received later disclosures or bought from individual owners and received whichever disclosures those sellers used. Ms. Pennington also admits that she viewed a Navy report about possible contamination, a report that other named plaintiffs do not claim to have reviewed. Ex. KK at 5-6; Ex. OO. She bought in May 2015, years before other class members, who could have purchased as late as 2018, when significantly different information was publicly available. Indeed, she filed her lawsuit *before* the August 2, 2018 San Francisco Chronicle article covering Congresswoman Pelosi's call for investigation, from which Plaintiffs allege class members first learned of contamination. ECF 265-1 ¶ 4. She has not sold her property or attempted to sell her property, and never attempted to rent her property, unlike other class members. Ex. Y, Pennington Tr. at 145:8-15. And she does not live full time on Parcel A. *Id*. at 102:5-7. Other class members will have different alleged harm regarding their fear of negative health impacts. Ms. Pennington's claims are not typical of other class members. Here, alleged harm depends on variables unique to each purchase and ownership experience.

For similar reasons, Ms. Pennington is not an adequate class representative. Adequacy turns upon resolution of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Anthem*, 327 F.R.D. at 309. Ms. Pennington is subject to unique defenses because she has admitted awareness of information disclosing risks that were not part of the standard disclosures to all purchasers, and because she no longer resides in the allegedly contaminated area.  Her interests therefore diverge from other class members in terms of what statements she will claim she relied on and the extent of the impact of

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

continuing exposure on emotional distress claims. For these reasons, she has "conflicts of interest with other class members" and should not act as a representative.

### B. Plaintiffs Cannot Demonstrate Predominance or Superiority

Plaintiffs fail to meet the Rule 23(b)(3)'s requirements that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1. Plaintiffs' Claims Do Not Present Common Questions That Predominate Over Individual Issues

Before certifying a class under Rule 23(b)(3), a district court must conduct a rigorous analysis of predominance, which is "even more demanding" than its Rule 23(a) counterparts. *Milan*, 340 F.R.D. at 598. In contamination cases specifically, predominance is not met where, like here, "the source of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage measured in diminution of property value, are all questions that will require plaintiff-by-plaintiff scrutiny." *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 384, 386 (N.D. Fla. 2017).

As explained *supra*, each of Plaintiffs' claims is mired in individual questions. *See also* Minute Order Regarding Motion for Preliminary Approval at 1, *Bayview Hunters Point Residents v. Tetra Tech EC, Inc.*, Case No. 3:19-cv-01417-JD, (Dec. 9, 2022), ECF 191 (denying class certification because "[i]t is not at all clear that common questions would predominate for this proposed class"). The fraud-related claims will depend on whether there was any statement or omission made by the Tetra Tech Defendants to each individual at the time of their purchase (which spans across the class from 2015 to 2018); whether that individual relied on any statement or omission; whether a purchaser did their own research on the contamination before buying; what materials each buyer received from the Lennar Defendants or the government before buying; and whether individuals bought for residential or investment purposes. *See supra at* 9-13. And even then, for a substantial portion of the named plaintiffs—and likely a vast majority of the class members—lost profits damages are unavailable as a matter of law. As demonstrated in Tetra Tech's concurrently-filed Motion for Partial Summary Judgment, whether each individual Plaintiff

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

purchased their Shipyard unit for residential or for investment purposes determines their ability to pursue lost profit damages. *See Stout v. Turney*, 22 Cal. 3d 718, 729, n.12 (1978) (damages not permitted "when property is purchased for residential purposes."); *In re Bungay*, 860 F.2d 1088, at *3 (9th Cir. 1988) ("A party has no reasonable expectation of profits 'when property is purchased for residential uses.'"). Some of the purported class members bought for residential purposes while others bought for investment reasons. This intra-class conflict as to the type of recoverable damages available to different class members defeats a finding of predominance and precludes certification.

For the nuisance claims, liability depends on whether a purchaser lived at the Shipyard, whether they sold, whether they claim any harm to their health, and when they purchased. *Supra* at 13-16. And for negligence, putting aside the gating issue of duty, the analysis will differ based on what warnings each class member received when purchasing their homes and what the Tetra Tech Defendants knew at the time based on when on the timeline the purchases fell. *Supra* at 16-19. Because these individual questions predominate, "class certification would snarl, delay and complicate this action beyond all recognition, spawning inquiries into liability, causation, reliance, timeliness and damages that would require adjudication on a plaintiff-by-plaintiff basis." *LaBauve*, 231 F.R.D. at 679.

### 2.    Plaintiffs Do Not Have A Viable Damages Model

Under *Comcast v. Behrend*, 569 U.S. 27, 35 (2013), Plaintiffs must offer a damages model that can reliably calculate the classwide damages that flow from their theory of liability. "Under *Comcast*, … plaintiffs bear the burden of providing a damages model showing that 'damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 600 (N.D. Cal. 2021) (Donato J.). "The damages model 'must measure only those damages attributable to' the plaintiffs' theory of liability… [and] must reasonably reflect the claims and evidence in the case." *Id.* (quoting *Comcast*). Plaintiffs' damages model falls far short of complying with *Comcast*. It neither flows from their theory of liability nor offers any method for reliably calculating damages.

Plaintiffs rely on Mr. Reynolds to provide a damages model, but his analysis is fatally

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

flawed. *See* Mot. to Exclude; Ex. MM, Gibbons Decl. at 3-5. First, Mr. Reynolds' damages model does not flow from Plaintiffs' theory of liability. Mr. Reynolds did not even analyze Plaintiffs' theory of harm. Rather, he admitted he did not look at the question of whether news of alleged fraud impacted appreciation, and only considered whether news concerning the existence of contamination at HPNS impacted home values. *See* Mot. to Exclude at 3-4; Ex. X, Reynolds Tr. 51:16-20 (testifying the work he did "has nothing to do with fraud of Tetra Tech. It's more about the contamination itself…"). Nor did Mr. Reynolds conduct anything close to a proper analysis for determining when the alleged appreciation impairment resulting from press coverage could have begun. His analysis consisted of a "couple hours of Googling" stories about HPNS contamination, apparently ignoring—or not finding—all of the widespread press reports prior to 2018. Ex. X, Reynolds Tr. at 58:19-61:17; 62:15-63:7; 67:14-68:11; 96:14-18.

Second, Mr. Reynolds' model does not offer a reliable method for calculating classwide damages. Mot. to Exclude at 8-15; Ex. MM, Gibbons Decl. at 3-5. Mr. Reynolds used an index for his comparison analysis that is not representative of the class members' units. The Shipyard consists only of condominiums and townhomes while the index Mr. Reynolds used measures single-family homes in not only San Francisco, but also Alameda, Contra Costa, Marin, and San Mateo Counties. *See* Mot. to Exclude at 8-10; Ex. MM, Gibbons Decl. ¶ 12(b). He acknowledged the significant differences between Shipyard homes and homes in his index and conceded there were far better points of comparison that he did not consider. *See* Mot. to Exclude at 10. Absent a reliable benchmark, Mr. Reynolds cannot make any supportable determination that "market-rate homes on Parcel A started lagging behind comparable homes throughout the Bay Area," ECF 265 at 12, let alone to what degree or resulting harm.

Mr. Reynolds' model contains additional fundamental flaws. Under Mr. Reynolds' model, "[w]hat makes sales impacted is that they were bought from the developer before news of the contamination was widely reported [*i.e.,* August 2, 2018], and then sold into a market that had priced in the contamination." Ex. X Tr. 94:23-95:3. However, Mr. Reynolds' analysis includes buyers who purchased *after* August 2, 2018, when he concedes that market would have already taken into account the allegedly damaging press reports. *See* Ex X, Reynolds Tr. at 122:21-123:1.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Mr. Reynolds' model also does not consider any alternative causes of appreciation impairment or confounding causes. *See* Mot. to Exclude at 13; Ex. MM, Gibbons Decl. ¶ 12. Nor did Mr. Reynolds perform any statistical analysis whatsoever to provide confidence in his results. *Id* ¶ 13. And on top of all that, Mr. Reynolds model admittedly contains mathematical errors. Mot. to Exclude at 14 n.2. His model comes nowhere close to satisfying *Comcast* and cannot support class certification. *See* Mot. to Exclude; Ex. MM, Gibbons Decl.

### 3.     Plaintiffs Cannot Demonstrate Superiority

Plaintiffs also fail to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs posit that a class action is the superior mechanism because a coordinated proceeding with "the pleadings of hundreds of plaintiffs will swell this Court's docket." ECF 265 at 20. But Plaintiffs' revision to the class definition since the settlement with the Lennar Defendants suggests that there will be "hundreds" of individual claims regardless of whether the Court certifies this most recently proposed class. Plaintiffs' counsel states that he "identified 437 individuals and entities" that meet the new class definition by examining the deeds of sales records identified by Mr. Reynolds to isolate "the names listed on the deeds to each of those homes as of August 2, 2018." ECF 265-15 ¶¶ 5-8. This is 225 fewer individuals than were included in the class for settlement purposes with the Lennar Defendants, *see* ECF 123 at 18 ("662 total Class Members"), yet Plaintiffs make no attempt to distinguish the two groups.

Even if the Court were to certify the proposed class, there would still be large numbers of individual claims outstanding, which negates any benefit of the class mechanism. Even multiple *named* plaintiffs are no longer part of the class, so they will either need to abandon their claims or proceed separately. *See* Ex. V at 3, 8; Ex. W at 3, 8. And even if joint harm theoretically could be established, Plaintiffs' expert conceded that "the degree of impairment is not consistent from the onset of the discovery of the contamination through year to date" and that "as time passes and the issue is not resolved, that's going to resonate in your appreciation impairment," meaning that damages would need to be individually calculated for each class member. Ex. X, Reynolds Tr. at 100:22-101:02; *see also id.* at 98:15-22.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Moreover, Plaintiffs admit that even if Mr. Reynolds' analysis is used, it only purports to measure appreciation impairment damages—the remaining claims would have to be adjudicated in multiple individual proceedings. Accordingly, if this action were to proceed as a class, any Plaintiff "pursu[ing] damages for annoyance and discomfort or fear of cancer" will have to prove those separately. ECF 265 at 19. That admission precludes certification. *See Georgine v. Amchen Prods., Inc.*, 83 F.3d 610 (3rd Cir. 1996) (individual nature of medical-related injuries prevented class certification). As this Court acknowledged in a hearing on a related case, fear of cancer is "not an easy tort." Hearing Transcript Regarding Motion for Preliminary Approval at 7, *Bayview Hunters Point Residents et al. v. Tetra Tech EC, Inc.*, Case No. 19-cv-01417 (Dec. 8, 2022), ECF 194. It requires a plaintiff to prove not only the elements of a negligence claim but also "the reasonableness of his or her fear of cancer" because "[a] carcinogenic or other toxic ingestion or exposure, without more, does not provide a basis for fearing future physical injury or illness which the law is prepared to recognize as reasonable." *Potter v. Firestone Tire & Rubber*, 6 Cal. 4th 965, 989 (1993). These individualized inquiries require individual trials—defeating any efficiency provided through proceeding as a class on claims for appreciation impairment.

When there are "myriad sources of harm, types of harm, and damages resulting from harm, individual issues dwarf whatever common issues there may be, such that a vast array of mini-trials would be required for each class member if certification were granted," thus "wash[ing] away" any efficiencies from proceeding as a class. *LaBauve*, 231 F.R.D. at 679. That is the case here. Plaintiffs' motion for class certification should be denied.

## V.     CERTIFICATION OF CERTAIN ISSUES IS NOT PROPER

Plaintiffs—tacitly recognizing the difficulty in certifying their claims—request certification of six issues as an alternative to certifying their claims. While Plaintiffs put forth an argument as to why certification of issues generally may be appropriate, they do not explain why any of the issues they identify in this case would be proper for certification under the requirements of Rule 23. Accordingly, they fail to provide even a colorable basis for certification of any of these issues. However, to the extent the Court considers these alternative issues for certification, for each of the reasons addressed *supra*, certification of any of them would be improper.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1

2   DATED: September 1, 2023          WILMER CUTLER PICKERING HALE
                                      AND DORR LLP
3

4

5                                By:       /s/ Christopher T. Casamassima
                                      DAVINA PUJARI
6                                     CHRISTOPHER A. RHEINHEIMER
                                      CHRISTOPHER T. CASAMASSIMA
7                                     MICHAEL J. BROWN

8
                                      *Attorneys for DEFENDANTS*
9                                     *TETRA TECH, INC., TETRA TECH EC,*
                                      *INC., and ANDREW BOLT*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION