Law Office of Catherine Golden
31103 Rancho Viejo Rd. ST 3010
San Juan Capistrano, CA 92675
Catherinegolden6@ gmail.com
(415) 374-910

December 9, 2024

Honorable James Donato
450 Golden Gate Avenue
San Francisco, CA 94102

Re: *Pennington et al. v. Tetra Tech, Inc. et al.*, 18-cv-05330; *Five Point Holdings, LLC et al. v. Tetra Tech, Inc. et al.*, 20-cv-01481; *CPHP Development LLC et al. v. Tetra Tech, Inc. et al.*, 20-cv-01485

Dear Judge Donato,

I represent Stephen Rolfe and submit this letter in response to *Pennington* counsel's request to retake Mr. Rolfe's deposition for two hours before this Court or one of the Court's clerks. (ECF 327 in the *Pennington* matter, 20-cv-05330-JD.)[1] Mr. Rolfe, who is no longer a party to these litigations, was subjected to fourteen hours of grueling, repetitive questioning by multiple Plaintiffs' counsel over three consecutive days. Plaintiffs now ask for a do-over in a quasi-judicial proceeding, principally to ask Mr. Rolfe about two documents—his plea agreement and his proffer interview report. Plaintiffs fail to mention that they examined Mr. Rolfe about those two documents alone for a total of ***seven and one-half hours***. Mr. Rolfe gave complete and responsive testimony about both documents, over and over again, until it reached the point where the questioning became improperly abusive and harassing. There is no basis for further questioning.

> I. **Mr. Rolfe's Physical and Mental Condition**

Mr. Rolfe is 76 years old and suffers from atrial fibrillation.[2] Because of his advanced age and compromised and frail condition, during the deposition, I paid close attention to his well-being and body language. On the first day of the deposition, I advised all counsel of Mr. Rolfe's medical condition and said we would need to take breaks whenever I believed he was physically or mentally struggling. Tr. Vol. I, 154:19-155:13. At various times over the next three days, Mr. Rolfe grew increasingly and visibly weary, as counsel repeated the same questions time and time again. *E.g.,* Tr. Vol. II, 384:1-2 ("You guys got me so confused, I don't know what I'm doing

---

[1] Plaintiffs' submission is six pages long, well beyond that allowed by the Court. Standing Order for Civil Discovery, Para. 18. To address Plaintiffs' allegations, I ask leave of Court to submit this enlarged letter brief, which is five pages long.

[2] Atrial fibrillation (AFib) is an irregular and often very rapid heart rhythm. An irregular heart rhythm is called an arrhythmia. AFib can lead to blood clots in the heart. The condition also increases the risk of stroke, heart failure and other heart-related complications. During atrial fibrillation, the heart's upper chambers — called the atria — beat chaotically and irregularly. They beat out of sync with the lower heart chambers, called the ventricles. For many people, AFib may have no symptoms. But AFib may cause a fast, pounding heartbeat, shortness of breath or light-headedness… AFib itself usually isn't life-threatening. But it's a serious medical condition that needs proper treatment to prevent stroke." https://www.mayoclinic.org/diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624

1

now."); *Id.* at 532:20-22 ("Right now I'm so confused. I see the same documents over and over. I don't know what I'm looking at. I can't remember back and forth."). I paused the deposition when I thought it was necessary so Mr. Rolfe could have a break from the relentless questioning. Those breaks did not count against Plaintiffs' time on the record. In fact, Mr. Rolfe made himself available to Plaintiffs on a third day to account for the increased need for breaks.

As Mr. Rolfe's counsel, I was aware of Plaintiffs counsels' track record of employing abusive and misleading tactics in depositions and was on guard to prevent any abuse of Mr. Rolfe. I previously saw Plaintiffs' counsel badger Tina Rolfe (my client's wife) for hours on end and was present in Court when Your Honor admonished the offending attorney. Case No. 3:20-cv-01481-JD, Tr. of Proceedings, April 18, 2024, at 7:25-8:13 (THE COURT: "How did you get to the point where you are saying things like 'listen to me, witness. I'm speaking slowly.' The implication being 'you are dumb as a post, why aren't you keeping up…If you are losing your cool, as you said you were…you count to ten"). I also attended Mr. Chiu's deposition, where the witness was—in his own words—"bullied into giving the answers," "forced into saying []thing[s], whether or not [he] believed it to be true," and "yelled … at" by Plaintiffs' counsel. Case No. 3:20-cv-01481, ECF No. 195.

I also knew that just days before the deposition of Mr. Rolfe, the same Plaintiffs' counsel that would be questioning Mr. Rolfe had deposed Justin Hubbard, and engaged in a bizarre and utterly improper trick on the witness, his counsel, and the Tetra Tech lawyers:

> [MR. DINTZER] Q. So just so we are clear, your testimony is that you did not discuss the substance of your testimony with your counsel since yesterday when we broke, correct?
>
> A. That will be my answer, correct.
>
> Q. All right. And would the same thing be true of the lawyers representing Tetra Tech throughout the entire deposition -- since you were sworn in, first day, have you had any conversations with them about the substance of your deposition?
>
> A. I haven't had any conversations with – I speak to Edwin. I don't speak to the Tetra Tech attorneys….
>
> Q. I know that's actually not true. ***I have a photograph of you standing outside talking to them.***
>
> MR. CASAMASSIMA: You are taking pictures of us, Jeffrey? Why are you doing that? That's really weird.
>
> Q. I want to know -- I want to know, did you talk with counsel for -- for, you know, Tetra Tech during the course of this deposition about your testimony?
>
> A. I have talked with the attorneys about many things, but I'm not discussing my court case with Tetra Tech attorneys…
>
> MR. CASAMASSIMA: Can I ask, when did you take pictures, how many pictures? …

2

>MR. DINTZER: I was kidding.
>
>MR. CASAMASSIMA: So it's not true that you took pictures of us?
>
>MR. DINTZER: I don't have a picture of you.
>
>MR. CASAMASSIMA: Why did you say that on the record? That's inaccurate. I object to that.
>
>MR. DINTZER: I apologize. Okay? All right? I apologize.
>Hubbard Dep. Tr. Vol II, 141:5-143:11 (emphasis added).

On top of what I knew would be a hostile deposition, I also knew that the last time my client spoke about these issues was during his criminal proceedings, when he "was in shock." Tr. Vol. I, 41:8, Tr. Vol III, 642:8-11 ("I didn't speak up [at the sentencing hearing]. I didn't really even hear anything. I was still a little nervous and in shock of the whole -- the whole surroundings."). In fact, at the sentencing hearing, Your Honor noticed Mr. Rolfe's shaky demeanor and asked him if he wanted to loosen his tie or drink some water. Jan. 24, 2018 Sentencing Hearing Tr., Case No. 17-123. I knew Mr. Rolfe would be uncomfortable throughout a deposition that would focus on the events at Hunters Point, and because of his advanced age and medical condition, wanted to ensure that he endured the proceedings with as little discomfort as possible.

With all this in mind, during the three days of deposition, I objected to counsels' questions when I believed appropriate and, on some occasions, instructed my client not to answer a question. Many of the occasions in which I instructed the client not to answer a question were in response to communications protected by the attorney-client or spousal privilege, including instances in which the questions infringed on the Common Legal Interest Mr. Rolfe has with Tetra Tech. As the deposition advanced, I also instructed my client not to answer questions that had been asked and answered on multiple occasions and were now being asked simply to harass him for not providing the answers that Plaintiffs' counsel apparently wanted.

## II.    Plaintiffs' Duplicative Questioning of Mr. Rolfe

Plaintiffs claim there are four areas in which I "obstructed" their examination of Mr. Rolfe: (1) questions about a criminal investigation report of a proffer Mr. Rolfe had given; (2) questions to which Mr. Rolfe did not complete his answer; (3) questions about his sentencing hearing; and (4) questions about his plea agreement. Plaintiffs are wrong on all four points and fail to provide the Court with an accurate accounting of what occurred.

### A.    Questions about a criminal investigation report

For almost *two and a half* hours, Plaintiffs questioned Mr. Rolfe about an EPA proffer interview report. [Exhibits 622 and 2002]. Counsel for Lennar, Mr. Marroso, began by reading the report to Mr. Rolfe, without identifying what he was reading, and asking Mr. Rolfe whether each statement in the document was true or false. Tr. Vol. I, 183:10-208:14. Mr. Marroso then introduced the report as an exhibit, instructed Mr. Rolfe to read it, and went through the document again, page by page, asking about specific language. *Id.* at 217:18-233:7. Then, Mr. Marroso introduced Exhibit 2002, a "copy" of the interview report that Mr. Marroso had

highlighted himself, and asked Mr. Rolfe to review the report and answer questions about those statements yet again. *Id.* at 233:7-234:6. The next day, counsel for Five Point, Mr. Dintzer, walked Mr. Rolfe through the same interview report and again asked him the same questions about the contents of the report. Tr. Vol. II, 507:7-507:12, 509:15-518:22.

The chart attached as **Exhibit A** shows the repetitive questioning about the interview report across three days by different counsel. For the most part, Mr. Rolfe answered all of counsels' repetitive questions—it was only when the questioning had gone well beyond information seeking, and was simply harassing, that I instructed Mr. Rolfe not to answer a question he had previously been asked, and had answered, multiple times.

B.      Questions in which Mr. Rolfe did not complete his answer

Plaintiffs cite two instances in which Mr. Rolfe answered a question but kept talking. Because Mr. Rolfe had answered the questions and there was no question pending, I instructed Mr. Rolfe not to ramble on, but rather, to await another question from counsel. I do not believe my conduct interfered with the deposition or was obstructionist in the least, and in both instances Plaintiffs' counsel continued their questioning of Mr. Rolfe.

C.      Questions about Mr. Rolfe's sentencing

Plaintiffs cite a single occasion in which I instructed Mr. Rolfe not to answer a question about his sentencing hearing. It occurred on the third day of Mr. Rolfe's deposition, after he had spent countless hours answering other questions about the sentencing proceedings. I deemed this one question to impinge upon Mr. Rolfe's attorney-client privilege because I knew that much of what Mr. Rolfe was told about his sentencing proceeding came through discussions with his criminal counsel. In fact, Mr. Rolfe's answer to a similar question did disclose privileged information, but on that occasion I could not object quickly enough to prevent the disclosure. Tr. Vol III, 607:11-22 ("Q. Have you subsequently learned that statements you made were inaccurate or untruthful? … THE WITNESS: Upon time and further review, I might not have had good counsel at the time I was in the meeting. BY MR. MARROSO: Q. I want to be very careful and not intrude on any discussions you had with counsel….").

D.      Questions about Mr. Rolfe's plea agreement

Plaintiffs' counsel questioned Mr. Rolfe about his plea agreement for *over five hours*. First, Mr. Marroso grilled Mr. Rolfe on the contents of the plea agreement by asking questions about the accuracy of each sentence in each substantive paragraph. Mr. Marroso read each line into the record without showing Mr. Rolfe the document and asked for Mr. Rolfe's reaction. Tr. Vol. I, 79:8-88:5. Then, Mr. Marroso introduced the plea agreement as an exhibit and repeated the process, going over the same sentences a second time. *Id.* at 88:6-10-112:18. After lunch, Mr. Marroso went through the statements in the plea agreement a third time, repeating questions about their accuracy yet again. *Id.* at 150:9-174:8. The next day, Mr. Dintzer repeated the exercise. He asked Mr. Rolfe to "go through … Exhibit 200" and "tell me each part … that you believe is untrue." Tr. Vol. II, 544:25-556:25. On the third day, Mr. Dintzer introduced Exhibit 2012, "a version of the plea agreement" in which he had highlighted the statements in the plea agreement which had been discussed at length the prior two days. Tr. Vol III, 574:19-575:7. Mr.

4

Rolfe was asked *again* to read those statements and state whether they were true. *Id.* at 576:3-578:11.

The chart attached at **Exhibit B** shows the extremely repetitive questioning about the plea agreement across three days by different counsel. I instructed Mr. Rolfe not to answer a question about his plea agreement because he had already testified to these same questions innumerable times. I believed then, and believe now, that counsels' intentionally repetitive questions on this subject had turned harassing and abusive.

### III. This Court Lacks Jurisdiction for Plaintiffs' Request

Even if there was a substantive basis for the requested relief, which there is not, this Court lacks jurisdiction to award it. Under Federal Rule of Civil Procedure 45, "[a] subpoena may command a person to attend a […] deposition" only in two circumstances: "within 100 miles of where the person resides, is employed, or regularly transacts business in person; or within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense." Courts have routinely held that "a district court cannot use its subpoena power to compel a witness to travel more than 100 miles." *Squires v. Toyota Motor Corp.*, No. 4:18-CV-00138, 2021 WL 1837540, at *3 (E.D. Tex. May 7, 2021), *citing West Wind Africa Line, Ltd. v. Corpus Christi Marine Servs. Co.*, 834 F.2d 1232, 1237 (5th Cir. 1988). Because Mr. Rolfe does not live, work, or regularly transact business within 100 miles of the Northern District of California, Plaintiffs cannot use the subpoena power of the Court to compel him to attend a deposition in this Court. Rather, under Rule 37(a)(2) and as widely upheld by courts, "the plaintiff must present its motion to compel the appearance of this non-party in the district court where the deposition will be taken." *Atlas Bolt & Screw Co. v. Textron Inc.*, No. 90 C 6503, 1991 WL 214064, at *2 (N.D. Ill. Oct. 17, 1991).

Simply put, Plaintiffs' request is outside the Court's jurisdiction. If Plaintiffs seek to compel Mr. Rolfe to sit for another deposition, ***on top of the 14 hours he has already endured***, they must file their motion in the Middle District of Florida where Mr. Rolfe resides.

### IV. Plaintiffs Letter Brief is Procedurally Improper

Plaintiffs claim the undersigned refused to meet and confer. This is not true, and Plaintiffs fail to accurately report what happened. At the end of the third day of the deposition, after Plaintiffs' fourteen hours of on-the-record questioning had expired, I stated, "The deposition is over. Are you meeting and conferring? If you're meeting and conferring, we can do that in a phone call tomorrow or on Monday." Tr. Vol. III, 708:22-25. Plaintiffs never contacted me requesting a "meet and confer" at any time during the 13 days following the conclusion of Mr. Rolfe's deposition on November 14. They chose to blatantly ignore this Court's orders for two weeks before filing their letter brief. Finally, as noted above, Plaintiffs' six-page submission is twice what the Court allows. These procedural flaws matter and are each, on their own, a reason to deny relief.

/s/   *Catherine Golden*
Catherine Golden
*Counsel for Stephen Rolfe*